UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANTOINE HAWKINS,

                              Plaintiff,

              v.                                    5:04-CV-132

COUNTY OF ONEIDA, NEW YORK; ONEIDA
COUNTY SHERIFF'S DEPARTMENT; DANIEL
MIDDAUGH, in his individual and official capacity
as SHERIFF; PETER PAVARATI, in his individual
and official capacity as UNDERSHERIFF; WILLIAM
CHAPPLE, in his individual and official capacity as
CHIEF; LT. BRENT JOHNSON, in his individual and
official capacity; SGT. MIKE SOWICH, in his individual
and official capacity; DAVE VINNEAU in his individual
and official capacity; WILLIAM NICHOLS, in his
individual and official capacity; JOHN DOES, in their
individual and official capacities as EMPLOYEES and
REPRESENTATIVES of the COUNTY OF ONEIDA,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                 OF COUNSEL:

A.J. BOSMAN, ESQ.
Attorney for Plaintiff
258 Genesee Street
Suite 301
Utica, New York 13502

GORMAN, WASZKIEWICZ, GORMAN & SCHMITT      BARTLE J. GORMAN, ESQ.
Attorneys for Defendants
1508 Genesee Street
Utica, New York 13502-5178

DAVID N. HURD
United States District Judge

**MEMORANDUM-DECISION and ORDER**

## I. INTRODUCTION

Plaintiff Antoine Hawkins ("plaintiff" or "Hawkins") brings this action against the County of Oneida, New York ("County"), the Oneida County Sheriff's Department ("Sheriff's Department"), Oneida County Sheriff Daniel Middaugh ("Sheriff Middaugh"), Undersheriff Peter Pavarati ("Undersheriff Pavarati"), Chief Deputy William Chapple ("Chief Deputy Chapple"), Lieutenant Brett Johnson ("Lt. Johnson"), Sergeant Mike Sowich ("Sgt. Sowich"), Correction Officer Dave Vienneau ("C.O. Vienneau"),[1] Correction Officer William Nichols ("C.O. Nichols"), and other unnamed employees and representatives of the County of Oneida ("Does").

Plaintiff asserts the following claims against each defendant: (1) racially discriminatory employment actions and racially hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296; (2) racially discriminatory employment actions and racially hostile work environment under 42 U.S.C. § 1983 ("§ 1983"), 42 U.S.C. § 1981 ("§ 1981"), and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; (3) conspiracy to violate civil rights under 42 U.S.C. § 1985 ("§ 1985"); (4) neglect to prevent § 1985 violations under 42 U.S.C. § 1986 ("§ 1986"); and (5) common law breach of contract, intentional infliction of emotional distress, wrongful termination, negligence, and gross negligence.

---

[1] In the complaint, plaintiff misspells defendant Dave Vienneau's surname as "Vinneau." The correct spelling, "Vienneau," will be used throughout this memorandum-decision.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  Plaintiff opposes.  Oral argument was heard on April 13, 2007, in Utica, New York.  Decision was reserved.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986); <u>Silver v. City Univ. of New York</u>, 947 F.2d 1021, 1022 (2d Cir. 1991).  The court will not try issues of fact on a motion for summary judgment, rather it will determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law."  <u>Rodriguez v. City of New York</u>, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510; <u>R.B. Ventures, Ltd. v. Shane</u>, 112 F.3d 54, 57 (2d Cir. 1997).  In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986);  <u>Gibbs-Alfano v. Burton</u>, 281 F.3d 12, 18 (2d Cir. 2002).

### III. __FACTS__

As noted above, in determining defendants' motion for summary judgment the facts must be viewed in a light most favorable to plaintiff.

In January 2000, the Sheriff's Department hired Hawkins, an African-American male, as a part-time correction officer at the County jail.  On December 28, 2000, the Sheriff's Department appointed him to a full-time correction officer position.  On June 26, 2002, the Sheriff's Department terminated his employment.

During the thirty months that plaintiff worked as a correction officer for the Sheriff's Department he was subjected to racist and racially charged treatment.  For example, on approximately three occasions, another correction officer, Deputy Baldwin, used the word "nigger" in plaintiff's presence.  On another occasion, while Haekins was walking to a staff meeting with a group of his fellow employees, another correction officer, Deputy Shazam, said to plaintiff "We need to take you back to confederate days."  (Hawkins Dep. 38:18-19.)  While walking with his fellow employees to another staff meeting, Deputy Shazam told Hawkins he was dressed like an inmate and said to the others "Let's take him down to booking; check if he's got any drugs on him."  (Hawkins Dep. 36:21-22, Mar. 14, 2006.)  Both of these comments were made in the presence of defendant Sgt. Sowich, a sergeant and superior.

In addition, plaintiff has provided a sworn affidavit stating that throughout his employment with the Sheriff's Department his fellow employees persistently used racial slurs including the words "nigger" and "coon," mocked him by using "black slang" such as "yo bro" and "wassup," and made references to "fried chicken" and "black guy with fat white girls." (Pl.'s Aff. ¶¶ 25-26.)

- 4 -

Furthermore, during his employment with the Sheriff's Department plaintiff was investigated by "CID," an internal investigations body, for having sexual relations with an inmate, and produced evidence that CID repeatedly accused him of and questioned him about bringing drugs into the facility and gang-membership.  The investigation for allegedly having sexual relations with an inmate was based on a statement made to a correction officer by a female inmate.  However, the accusations and investigations related to alleged drug- and gang-related activity do not appear to have been based on any legitimate grounds.

Also, plaintiff has testified that an inmate, Joseph Rios ("Rios"), told him that another correction officer, Deputy Carl Watson, said "Hawkins is for the brothers," id. at 51:23 – apparently referring to his belief that Hawkins's duties were or should have been limited to dealing only with African-American inmates; and "he won't be here for long," id. at 51:25 – apparently referring to his belief that Hawkins would not be employed by the Sheriff's Department for long because he is African-American.  Plaintiff has testified that Rios told him that another correction officer, Deputy Lisa Zurich, said that working with plaintiff was like working with the inmates.  Defendants have not objected to this testimony on hearsay grounds.[2]

During his employment with the Sheriff's Department, plaintiff applied for training that would make him eligible for the Sheriff's Emergency Response Team ("SERT").  However, the Sheriff's Department denied plaintiff's application on the ground that, due to a lack of interest, no SERT training was being offered at that time.  Plaintiff also applied for

---

[2] Plaintiff has also alleged that correction officers regularly referred to African-American inmates as "niggers," "moolies," "jungle bunnies," and "natives," (Compl. ¶ 35), and that the SERT team used "Nazi-like gestures," including straight-legged marching known as "jack-booting," and named prison blocks after infamous Nazi concentration camps, such as "Auschwitz" and "Buchenwald" (Compl. ¶ 35).  However, plaintiff has provided no evidence in support of these allegations.

tower and weapons training; however, the Sheriff's Department denied those applications on the ground that he was a probationary employee and therefore ineligible for such training.

On August 26, 2001, Hawkins was pulled over by Sheriff's Deputy Scott Riley ("Deputy Riley") for speeding. According to Deputy Riley, during the stop plaintiff acted in a disrespectful manner toward him. Deputy Riley ticketed plaintiff for failure to produce proof of insurance and released him. He then informed the Sheriff's Department that he believed plaintiff acted in a disrespectful manner toward him. As a result, the Sheriff's Department filed a slew of formal disciplinary charges against Hawkins. After a hearing, Hawkins received a written reprimand and his probationary period was extended for a period of six months as punishment for the August 26 incident.

In June 2002, plaintiff allowed an inmate to perform his security tour. The inmate pushed the watch tour button activated by plaintiff while plaintiff remained at his desk. This was observed by one of his fellow correction officers and one of his superiors, Sergeant Geraldine Mietlinkski ("Sgt. Mietlinski"). Sgt. Mietlinski reported what she observed to defendant Lt. Johnson who commenced an investigation into plaintiff's conduct. Hawkins admitted to allowing the inmate to perform his security tour and asked for leniency. As a result of the investigation and hearing, defendant Chief Deputy Chappel recommended to defendant Undersheriff Pavarati that plaintiff, who was in the last few weeks of his probationary period, be terminated.

On June 20, 2002, Pavarati informed Hawkins that his employment with the Sheriff's Department was terminated effective June 26, 2002, for failure to satisfy his probationary period. Plaintiff requested and received an exit interview with Chief Deputy Chappel.

Thereafter, plaintiff filed a complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Defendants did not respond to plaintiff's EEOC complaint despite being given an opportunity to do so.  On June 9, 2003, the EEOC issued a determination finding that defendants engaged in employment discrimination in violation of Title VII.  Plaintiff received a Notice of Right to Sue letter in November 2003 and filed this action in February 2004.

## IV.  DISCUSSION

### A.  Title VII and NYSHRL Claims[3]

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C.A. § 2000e-2(a) (2003).

Defendants move for summary judgment on plaintiff's Title VII claims on the grounds that (1) the individual defendants are not "employers" under Title VII; (2) plaintiff's discriminatory employment action claims fail because he cannot show that defendants' stated legitimate, nondiscriminatory reasons for taking those employment actions are pretextual; and (3) no reasonable jury could find in his favor on the hostile work environment claim.

---

[3] As the New York Court of Appeals has pointed out "[t]he standards for recovery under the New York State Human Rights Law [including Executive Law § 296] are the same as the federal standards under [T]itle VII." Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 n.3 (2004).  Therefore, even though the ensuing legal analyses are in terms of federal law, they apply equally to plaintiff's NYSHRL claims.

1. **"Employer"**

Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."  42 U.S.C.A. § 2000e(b) (2003).

In this case, plaintiff asserts Title VII claims against the County and the Sheriff's Department – which, to be sure, are both "employers" under Title VII – as well as individual defendants Middaugh, Pavarati, Chapple, Johnson, Sowich, Vienneau, and Nichols in their individual and official capacities.  It is well-established that individuals cannot be held personally liable under Title VII.  See Tomka v. Seiler Corp., 66 F.3d 1295, 1313-14 (2d Cir. 1995).  Whether individuals can be named as defendants and held liable in their official capacities as agents of an employer is a separate question.

In Coraggio v. Time Inc. Magazine Co., No. 94 CIV. 5429, 1995 WL 242047 (S.D.N.Y. Apr. 26, 1995), the court held that individuals can be named as defendants and held liable in their official capacities as agents of an employer under Title VII.  Id. at * 8.  As that court explained:

> It is not anomalous to permit individuals to be named as defendants, even though no judgment can be collected from them.  I decline to follow the reasoning in Bramesco v. Drug Computer Consultants, 834 F. Supp. 120, 123 (S.D.N.Y. 1993), that if the claims levied against an individual are also chargeable to the employer, "plaintiff gains nothing apart from consumption of time and creation of bitterness by inclusion of the individual as a defendant."  Both tangible and intangible benefits accrue to plaintiffs who name individual wrongdoers as defendants.  The Federal Rules of Civil Procedure ("Rules"), for example, facilitate discovery against parties by requiring them to produce on notice relevant documents in their possession, whereas documents possessed by non-parties must be obtained by subpoena.  Compare Fed. R. Civ. P. 34 with Fed. R. Civ. P. 45.  As is apparent from the Rules, the same is true for depositions; a party can

be deposed on notice, whereas the deposition of a non-party witness may have to be compelled by subpoena.  See Fed. R. Civ. P. 30.  Moreover, if only employers could be named as Title VII defendants, those employees who allegedly committed discriminatory acts would escape public accountability, while those who played no part in the purported discrimination are unnecessarily stigmatized.  In this respect, an employer-only approach is both under-inclusive and over-inclusive.  By contrast, naming individuals as defendants identifies the alleged wrongdoers, forcing them to answer for their acts publicly, even if they do not have to answer for them financially.  If they are vindicated, their names are cleared.

Id.

Some district courts in this Circuit agreed with the Coraggio holding, see, e.g., Abdullajeva v. Club Quarters, Inc., No. 96 Civ 0383, 1996 WL 497029 (S.D.N.Y. Sept. 3, 1996); others did not, see, e.g., Bakal v. Ambassador Constr., No. 94 CIV. 584, 1995 WL 447784 (S.D.N.Y. July 28, 1995).  In Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235 (2d Cir. 1995), the Second Circuit held, as it did in Tomka, that individuals cannot be held personally liable under Title VII, but left open the question whether individuals can be named as defendants and held liable in their official capacities.  While the Corragio court proposes some interesting justifications for allowing Title VII plaintiff to name individual defendants in their official capacities, the vast majority of district courts in this Circuit, as well as the author of Coraggio, have come to reject that notion.  See, e.g., Gray v. Shearson Lehman Bros., 947 F. Supp. 132 (S.D.N.Y. 1996) (disavowing own reasoning in Coraggio) (Mukasey, J.); Tishman v. Associated Press, No. 05 Civ. 4278, 2005 WL 3466022 (S.D.N.Y. Dec. 16, 2005); Bottage v. Suburban Propane, 77 F. Supp. 2d 310 (N.D.N.Y. 1999); Wilcox v. PRC of New York L.P., No. 95-CV-1292, 1997 WL 141682 (N.D.N.Y. Mar. 24, 1997); Perks v. Town of Huntington, 96 F. Supp. 2d 222 (E.D.N.Y. 2000); Warheit v. De Graff Mem'l Hosp., No. 97-

CV-37E, 1998 WL 89346 (W.D.N.Y. Feb. 24, 1998); Reiger v. Orlor, Inc., 427 F. Supp. 2d 105 (D. Conn. 2006).

Thus, defendants' motion for summary judgment on plaintiff's Title VII and NYSHRL claims against the individual defendants in their individual and official capacities will be granted.

### 2. Discriminatory Employment Action Claims

To make a prima facie showing of a discriminatory employment action under Title VII, a plaintiff must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). Once the plaintiff has made this showing, the burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Terry, 336 3d at 138. Once the employer produces such a reason, the burden then shifts back to the plaintiff to show that the employer's stated reason is pretext for discrimination. McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. at 1825; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-16, 113 S. Ct. 2742, 2752 (1993); Terry, 336 F.3d at 138.

Defendants do not dispute that plaintiff has made a prima facie showing of discriminatory employment actions. Rather, defendants argue that plaintiff has failed to show that their stated legitimate, nondiscriminatory reasons for denying him training opportunities, extending his probationary period, and finally discharging him are pretextual.

To show pretext, a plaintiff must demonstrate "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997). Particularly relevant to the pretext discussion in a case like this one would be evidence that white correction officers similarly situated to plaintiff were not subjected to similar adverse employment actions. Also relevant to the discussion would be evidence that plaintiff was subjected to other racially discriminatory treatment during his employment with the Sheriff's Department, or that defendants are guilty of a general pattern of discrimination against African-American employees. See McDonnell Douglas, 411 U.S. at 804-05; 93 S. Ct. at 1825.

Hawkins asserts that defendants denied him training opportunities and that that constitutes a discriminatory employment action under Title VII. In response, defendants assert that plaintiff did not receive SERT training because no SERT academy was held during his employment, and he did not receive tower or weapons training because probationary employees are not eligible for such training. Hawkins has not produced evidence that suggests that defendants' stated reason for denying him tower and weapons training is pretext. However, with regard to the SERT training, plaintiff points to the affidavit of Chief Deputy Chappel in relation to a factually similar case, Patterson v. County of Oneida, No. 5:00-CV-1940, 2002 WL 31677033 (N.D.N.Y. Oct. 30, 2002), aff'd in part and vac'd in part by 375 F.3d 206 (2d Cir. 2004), wherein he states that Patterson was denied SERT training because he was a probationary employee. Plaintiff submits that the fact that defendants' stated reason in the Patterson case is inconsistent with their stated reason in this case is evidence of pretext. However, those stated reasons are not necessarily

inconsistent.  If there had been enough interest in SERT training and a SERT academy had been held, but defendants denied plaintiff SERT training for a reason other than his probationary status, plaintiff would have a valid argument.  Even if that were the case, it is still not clear that that would be enough evidence to permit a rational fact-finder to infer that defendants' denial of SERT training opportunities was more likely than not based in whole or in part on discrimination.

Therefore, defendants motion for summary judgment on plaintiff's Title VII and NYSHRL discriminatory employment action claims as they pertain to the denial of training opportunities will be granted.

Hawkins also asserts that the extension of his probationary period constitutes a discriminatory employment action under Title VII.  In response, defendants assert that the extension was the result of plaintiff's August 26, 2001, encounter with Deputy Riley.  To reiterate, Deputy Riley stopped plaintiff for speeding and during the stop plaintiff allegedly acted in a disrespectful manner toward him.  As a result, defendants filed a slew of formal disciplinary charges against Hawkins, and ultimately imposed a penalty in the form of a six-month extension of his probationary period.

Hawkins has produced evidence that several white correction officers guilty of similar or, in some cases, more serious misconduct were not disciplined as severely as he was:

"Correction Officer No. 1,"[4] a white male, was stopped for speeding by a Sheriff's Department officer on two occasions.  As a result, he received verbal counseling.  It should

---

[4] For privacy reasons, the actual names of the correction officers have been redacted from their personnel files.

be noted that it is unclear as to whether he was a probationary employee at the time of his violations and/or discipline.

"Correction Officer No. 25," a white male, informed defendants on April 8, 2001, that several days prior he had been involved in a car accident and was arrested for driving while intoxicated ("DWI").  Defendants launched an investigation several days later.  In June 2001 he informed defendants that he was convicted of the DWI charge.  His probationary period ended in November 2001.  Defendants filed disciplinary charges against him January 2002 and imposed a penalty in the form of a four-day suspension without pay and a written reprimand.

"Correction Officer No. 2," a white female, was arrested for Aggravated Unlicensed Operation of a Motor Vehicle and issued several tickets for a variety of traffic violations as a result of one traffic stop.  Despite plaintiff's contention that this occurred during her probationary period, the evidence is somewhat ambiguous in that respect.  Also, defendants became aware, during her probationary period, of an incident where she wrote a bad check at a Wal-Mart store.  It is unclear whether she was arrested or otherwise penalized for writing the bad check.  Interestingly, she was counseled several times and eventually had her probation extended 43 days, as required by the New York Civil Service Law, for excessive absences, but not her criminal activity.

"Correction Officer No. 3," a white male, was arrested for DWI while still a provisional employee.  He received a counseling memorandum.

While these correction officers were not similarly situated to plaintiff in every way, certainly evidence of their misconduct and resulting punishments as compared to plaintiff's is

"sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern, 131 F.3d at 312.

Plaintiff asserts that his discharge constitutes a discriminatory employment action under Title VII.  In response, defendants assert that he was discharged for allowing an inmate to perform his security tours.  Plaintiff has produced evidence that a number of white correction officers on probationary status were found guilty of similar security-related misconduct but were not discharged:

"Correction Officer No. 6," a white male, failed to secure inmates under his supervision, failed to abide by the "Lock-In Lock-Out" policy, and committed another unspecified security breach.  As a result, he received verbal and written counseling.

"Correction Officer No. 7," a white male, failed to secure eighteen out of thirty-two gates on a cell block in violation of the Lock-In Lock-Out policy and failed to conduct a proper watch tour.  As a result, he received verbal and written counseling.

"Correction Officer No. 11," a white male, improperly allowed an inmate out of his cell, failed to secure a gate resulting in a security breach, and left inmates at a work station unattended.  He received verbal and written counseling.

"Correction Officer No. 23," failed to secure a utility room, failed to properly complete log entries, was caught playing cards with an inmate, and committed an unspecified security breach.  As a result, he received verbal and written counseling.

Again, while some of these correction officers were not similarly situated to plaintiff in every way, evidence of their misconduct and resulting punishments as compared to plaintiff's is "sufficient to permit a rational finder of fact to infer that the defendant's

employment decision was more likely than not based in whole or in part on discrimination." Stern, 131 F.3d at 312.

Therefore, defendants' motion for summary judgment on plaintiff's Title VII and NYSHRL discriminatory employment action claims as they pertain to the extension of his probationary period and termination will be denied.

### 3.  Hostile Work Environment Claim

It is clear from the text of Title VII, particularly 42 U.S.C. § 2000e-2(a), that employers are prohibited from taking discriminatory employment actions against employees; however, Title VII also prohibits employers from subjecting employees to a racially hostile work environment.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S. Ct. 367 (1993) (hostile work environment claim based on gender).

To prove a claim of hostile work environment under Title VII, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris, 510 U.S. at 21, 114 S. Ct. at 370 (internal quotation marks and citations omitted); see Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006).  There is both an objective and subjective component to the hostile work environment analysis – a plaintiff must show that a reasonable person in his situation would have perceived the working environment to be hostile or abusive, and also that he actually perceived it to be so.  Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283 (1998); see Harris, 510 U.S. at 21-22, 114 S. Ct. at 370; Demoret, 451 F.3d at 149. There is no mathematical formula for determining whether a particular situation constitutes a hostile or abusive working environment; rather, that inquiry requires an examination of the

totality of the circumstances in each case.  Harris, 510 U.S. at 22-23, 114 S. Ct. at 371.

Factors that may be considered include "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; . . .

whether it unreasonably interferes with an employee's work performance"; and whether any

psychological harm to the plaintiff resulted therefrom.  Id. at 23, 114 S. Ct. at 371.  Of course,

courts are not required to consider all of these factors, nor is any one of these factors

necessarily dispositive in the overall analysis.  Id.

In this case, on approximately three occasions during plaintiff's employment with the

Sheriff's Department, Deputy Baldwin used the word "nigger" in his presence.  According to

plaintiff, he did not report Deputy Baldwin's conduct to his superiors because he had

previously complained of racist treatment to Lt. Johnson and he did nothing in response.  On

another occasion, Deputy Shazam said to plaintiff "[w]e need to take you back to confederate

days."  (Hawkins Dep. 38:18-19.)  Hawkins did not report Deputy Shazam's comments

because, again, he claims he had previously complained of similar conduct and nothing was

done about it.  However, Deputy Shazam's comment was made in the presence of defendant

Sgt. Sowich.

A number of other incidents occurred which, while not as blatantly racist as the two

mentioned above, might reasonably be construed as racially discriminatory intimidation,

ridicule, or insult.  For example, while plaintiff and other correction officers, including Sgt.

Sowich, were walking to a staff meeting, Deputy Shazam said to the crowd "[l]et's take him

down to booking; check if he's got any drugs on him."  Id. at 36:21-22.  Moreover, plaintiff

testified at his deposition that Rios, an inmate, told him that a Deputy Watson said "Hawkins

is for the brothers," id. at 51:23 – apparently referring to his belief that plaintiff's duties were

or should have been limited to dealing only with African-American inmates; and "he won't be here for long," id. at 51:25 – apparently referring to his belief that plaintiff would not be employed by the Sheriff's Department for long because he is African-American.  Hawkins has testified that Rios told him that Deputy Zurich said that working with plaintiff was like working with the inmates.[5]

Hawkins has also asserted, in the form of a sworn affidavit, that Sheriff's Department employees, with persistence, used racial slurs including the words "nigger" and "coon," mocked him by using "black slang" such as "yo bro" and "wassup," and made references to "fried chicken" and "black guy with fat white girls."  (Pl.'s Aff. ¶¶ 25-26.)  That plaintiff has not provided detailed accounts of specific instances in which Sheriff's Department employees engaged in such conduct does not render these more general assertions of racially discriminatory conduct unworthy of consideration.  For it would be unreasonable to require such detailed accounts where, as here, the plaintiff's allegations and supporting evidence indicate that racially discriminatory conduct was perpetrated with great persistence and nonchalance by numerous people for more than two years.

Furthermore, plaintiff has produced evidence that he was investigated by CID for having sexual relations with an inmate.  He has also testified that CID repeatedly accused him of and questioned him about bringing drugs into the facility and gang-membership.  Plaintiff has further testified that those accusations and investigations were baseless.  Moreover, defendants have produced no evidence tending to justify such accusations and investigations related to alleged drug- and gang-related activity.  Therefore, a reasonable

---

[5] There appear to be hearsay issues with plaintiff's testimony as it relates to information he received from Rios; however, at this stage defendants have not objected to the admissibility of such testimony.

juror could find that the CID accusations and investigations were motivated by racial animosity, and thus constituted racially discriminatory intimidation, ridicule, or insult.

Hawkins has raised questions of fact as to whether he was subjected to discriminatory intimidation, ridicule, and insult that was so severe or pervasive that it altered the conditions of his employment and created an abusive working environment.

Therefore, defendants' motion for summary judgment on plaintiff's hostile work environment claims under Title VII and the NYSHRL against the County and Sheriff's Department will be denied.

### B. Section 1983 Claims

Section 1983 provides, in relevant part, that "[e]very person who, under color of [state authority] . . ., subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . for redress."  42 U.S.C.A. § 1983 (2003).  Thus, § 1983 provides a private right of action to citizens who have been deprived of their federal constitutional or statutory rights.  In this case, plaintiff brings three § 1983 claims: (1) racially discriminatory employment actions under § 1981, (2) racially hostile work environment under § 1981, and (3) denial of equal protection under the Fourteenth Amendment.

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C.A. § 1981(a) (2003).  Section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

contractual relationship," id. § 1981(b), including in the employment setting.  See Patterson v. County of Oneida, 375 F.3d 206, 224-225 (2d Cir. 2004).

The Fourteenth Amendment provides, in relevant part, that: "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection Clause prohibits discrimination, including that which occurs in the employment setting, whereby a person is treated differently than other similarly situated individuals, and such treatment is motivated by an intention to discriminate on the basis of his membership in a protected class, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.  See Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995).

Generally, the same legal standards apply to Title VII claims and employment-related claims under § 1983, including plaintiff's § 1981 and equal protection claims. However, there are some legally significant differences between Title VII and § 1983 such that further discussion of the § 1983 claims is warranted.

### 1. Individual Liability

While there is no individual liability under Title VII, individual defendants can be held liable under § 1983.  Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000); Patterson, 375 F.3d at 229.  To make out a § 1983 claim against an individual defendant, a plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action."  Whidbee, 223 F.3d at 75 (internal quotation marks omitted). In other words, the plaintiff must show that the individual defendant was personally involved in the discriminatory conduct.  Id.  Personal involvement, at least in this sense, includes direct participation in the discriminatory acts, gross negligence in the supervision of

subordinates who committed the discriminatory acts, and failure to take action upon receiving information that the discriminatory acts were occurring.

In this case, Hawkins asserts § 1983 claims against Sheriff Middaugh, Undersheriff Pavarati, Chief Deputy Chapple, Lt. Johnson, Sgt. Sowich, C.O. Vienneau, and C.O. Nichols. With respect to the § 1981 discriminatory employment action and equal protection claims, plaintiff has shown that defendant Undersheriff Pavarati actually made the decisions to extend his probationary period and terminate his employment, and that Chief Deputy Chappel made a recommendation to Undersheriff Pavarati that plaintiff be terminated. Questions of fact exist as to whether the extension of plaintiff's probationary period and his discharge were motivated by racial animus. (See Pt. III.B.2 supra.)

Therefore, defendants' motion for summary judgment on plaintiff's § 1981 discriminatory employment action and equal protection claims under § 1983 against Sheriff Middaugh in his individual capacity,[6] and Lt. Johnson, Sgt. Sowich, C.O. Vienneau, and C.O. Nichols, in their individual and official capacities, will be granted. However, defendants' motion on plaintiff's § 1981 discriminatory employment action and equal protection claims against Undersheriff Pavarati and Chief Deputy Chappel, in their individual and official capacities, will be denied.

With respect to the § 1981 hostile work environment claim, Hawkins has produced no evidence indicating that Sheriff Middaugh, Undersheriff Pavarati, Chief Deputy Chapple, C.O. Vienneau, or C.O. Nichols were personally involved in any of the alleged discriminatory

---

[6] Plaintiff has produced no evidence indicating that Sheriff Middaugh was personally involved in any of the discriminatory conduct. Therefore, Sheriff Middaugh cannot be held individually liable under any of the § 1983 claims. However, as head of the Sheriff's Department, Sheriff Middaugh may be held liable in his official capacity. Thus, none of the claims brought under § 1983 will be dismissed as against Sheriff Middaugh in his official capacity.

conduct.  He has, however, produced evidence that Sgt. Sowich was present when Deputy

Shazam made racist and racially charged remarks toward him.  He has also shown that he

complained to Lt. Johnson, his supervisor, of racist and racially charged remarks and

treatment.  While there is evidence that Lt. Johnson conducted an investigation into at least

one of plaintiff's complaints, plaintiff has raised questions of fact as to whether he did so in

earnest on that occasion and whether he failed to take action on other occasions.

Therefore, defendants motion for summary judgment on plaintiff's § 1981 hostile

work environment claim against defendants Sheriff Middaugh in his individual capacity, and

Undersheriff Pavarati, Chief Deputy Chapple, C.O. Vienneau, and C.O. Nichols, in their

individual and official capacities, will be granted.  However, defendants' motion on plaintiff's §

1981 hostile work environment claim against defendants Lt. Johnson and Sgt. Sowich, in

their individual and official capacities, will be denied.

### 2.  Municipal Liability

When a plaintiff sues a municipality or an individual in his official capacity for

discrimination under § 1983, he must show that the discriminatory conduct occurred pursuant

to a municipal policy, custom, or practice.  Patterson, 375 F.3d at 226.  According to the

Patterson court:

> To show a policy, custom, or practice, the plaintiff need not identify an
> express rule or regulation.  It is sufficient to show, for example, that a
> discriminatory practice of municipal officials was so persistent or
> widespread as to constitute a custom or usage with the force of law, or that
> a discriminatory practice of subordinate employees was so manifest as to
> imply the constructive acquiescence of senior policy-making officials.  A
> policy, custom, or practice may also be inferred where the municipality so
> failed to train its employees as to display a deliberate indifference to the
> constitutional rights of those within its jurisdiction.

Id. (extensive quotation marks and citations omitted).  Also, "[a]ctions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim."  Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 106 S. Ct. 1292, 1300 (1986)).

In this case, Hawkins has not shown that defendants so failed to train its employees as to display a deliberate indifference toward his constitutional and statutory rights. Defendants' have submitted evidence of its training regimen, which includes instruction on, among other things, cultural diversity and constitutional and statutory rights in the workplace. Plaintiff has not produced evidence, outside of the racist and racially charged conduct directed toward plaintiff and other minorities, that demonstrates defendants' failure to train its employees.

However, Hawkins has shown that Undersheriff Pavarati made the decisions to extend his probationary period and terminate his employment.  As Undersheriff, Pavarati had final policy-making authority with respect to personnel and disciplinary matters within the Sheriff's Department.  Therefore, he was a policy-making official and his actions in extending plaintiff's probationary period and terminating his employment could very well have constituted official policy.

Moreover, plaintiff has raised questions of fact as to whether there was a persistent or widespread custom of discrimination within the Sheriff's Department.  Aside from his own testimony, plaintiff has submitted an affidavit of former Sheriff's Department employee and secretary to Undersheriff Pavarati, Mary Kalk Bielby. Ms. Bielby's affidavit recounts many instances when Undersheriff Pavarati demonstrated, through words and actions, discriminatory attitudes toward African-American employees.  Further, many of these

instances occurred while plaintiff was employed by the Sheriff's Department.

Therefore, defendants' motion for summary judgment on plaintiff's claims under §
1983 against the County, the Sheriff's Department, and Sheriff Middaugh, Undersheriff
Pavarati, Chief Deputy Chapple, Lt. Johnson, and Sgt. Sowich in their official capacities, will
be denied.

### 3. Discriminatory Intent

A plaintiff suing for discrimination under § 1983 must demonstrate that the
defendants acted with discriminatory intent.  Patterson, 375 F.3d at 226.

In this case, Hawkins has raised questions of fact as to whether the County, the
Sheriff's Department, Undersheriff Pavarati, Chief Deputy Chapple, Sgt. Sowich, and Lt.
Johnson acted with discriminatory intent.  However, he has not done so with respect to
Sheriff Middaugh, C.O. Vienneau, or C.O. Nichols.

Therefore, defendants' motion for summary judgment on plaintiff's § 1983 claims
against Sheriff Middaugh in his individual capacity, and C.O. Vienneau and C.O. Nichols in
their individual and official capacities will be granted.  However, defendants' motion for
summary judgment on plaintiff's § 1983 claims against Sheriff Middaugh in his official
capacity, and Undersheriff Pavarati, Chief Deputy Chapple, Sgt. Sowich, and Lt. Johnson in
their individual and official capacities will be denied.

### C. Qualified Immunity

Defendants move for summary judgment on plaintiff's equal protection claim against
the individual defendants in their individual capacities on the ground that they are entitled to
qualified immunity.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

In this case, Hawkins claims that defendants violated his constitutional right to equal protection of the laws. To be sure, the constitutional right to equal protection of the laws is clearly established. Moreover, taking the evidence in a light most favorable to plaintiff, it cannot be said that a reasonable person would not have known that the conduct of Undersheriff Pavarati, Chief Deputy Chapple, Lt. Johnson, or Sgt. Sowich violated that right.

Therefore, defendants' motion for summary judgment on qualified immunity grounds will be denied.

### D.  Section 1985 and 1986 Claims

Defendants move for summary judgment on plaintiff's claims under §§ 1985 and 1986 on the ground that he has not produced any evidence in support thereof.

To prove a claim of conspiracy to violate civil rights under § 1985(3), a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . ; (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States." Brown v. City of Oneonta, 221 F.3d 329, 341 (2d Cir. 2000) (quoting Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993)). In addition, the conspiracy must be motivated by racial animus. Id.

Section 1986 provides for a private right of action against persons who neglect to prevent § 1985 violations.  See 42 U.S.C.A. § 1986 (2003).

In this case, Hawkins has alleged in generic and conclusory terms that "defendants conspired for the purpose of depriving plaintiff of the equal protection of the laws."  (Compl. ¶ 30.)  Plaintiff has produced no evidence which shows that any of the defendants conspired or arrived at some sort of agreement to deprive him of his civil rights.

Therefore, defendants' motion for summary judgment on plaintiff's claims under §§ 1985 and 1986 will be granted.

### E.  Common Law Claims

Defendants move for summary judgment on plaintiff's common law claims for breach of contract, intentional infliction of emotional distress, wrongful termination, negligence, and gross negligence on various grounds.

In light of the lack of evidence produced in support of these claims, and plaintiff's failure to address them in response to defendants' motion for summary judgment, defendants' motion for summary judgment on plaintiff's common law claims will be granted.[7]

## V.  CONCLUSION

In sum, Hawkins has raised questions of material fact with respect to his Title VII and NYSHRL claims against the County and the Sheriff's Department.  Moreover, plaintiff has raised questions of material fact with respect to his § 1983 claims against the County, the Sheriff's Department, and those individual defendants who were personally involved in

---

[7]  In any event, plaintiff's intentional infliction of emotional distress claim is time-barred.  Under New York law, the statute of limitations for an intentional infliction of emotional distress claim is one year, N.Y. C.P.L.R. § 215(3), and it is not tolled during the pendency of an EEOC claim.  See Small v. Allstate Ins. Co., 396 F. Supp. 2d 364, 375 (S.D.N.Y. 2005).  In this case, plaintiff's employment with the Sheriff's Department was terminated in June 2002; however, he did not file this action until February 2004.

the discrimination.  However, plaintiff has failed to raise such questions of fact with respect to his claims asserted under §§ 1985 and 1986 and the common law.

Accordingly, it is

ORDERED that:

1.  Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2.  Defendants' motion for summary judgment on plaintiff's Title VII and NYSHRL claims against the individual defendants in their individual and official capacities is GRANTED;

3.  Defendants' motion for summary judgment on plaintiff's discriminatory employment action and equal protection claims as they pertain to the denial of training opportunities is GRANTED;

4.  Defendants' motion for summary judgment on plaintiff's § 1981 discriminatory employment action and equal protection claims under § 1983 against Sheriff Middaugh in his individual capacity, and Lt. Johnson, Sgt. Sowich, C.O. Vienneau, and C.O. Nichols, in their individual and official capacities is GRANTED;

5.  Defendants' motion for summary judgment on plaintiff's § 1981 hostile work environment claim under § 1983 against Sheriff Middaugh in his individual capacity, and Undersheriff Pavarati, Chief Deputy Chapple, C.O. Vienneau, and C.O. Nichols, in their individual and official capacities is GRANTED;

6.  Defendants' motion for summary judgment on plaintiff's claims under § 1983 against defendants Sheriff Middaugh in his individual capacity, and C.O. Vienneau and C.O. Nichols in their individual and official capacities is GRANTED;

7.  Defendants' motion for summary judgment on plaintiff's claims under §§ 1985 and 1986 is GRANTED;

8.  Defendants' motion for summary judgment on plaintiff's common law claims is GRANTED;

9.  The above-mentioned claims are all DISMISSED;

10.  Defendants C.O. Vienneau, C.O. Nichols, and Does are DISMISSED from the action; and

11.  The following claims remain for trial:

a.  Title VII and NYSHRL discriminatory employment action claims against the County and the Sheriff's Department, as they pertain to the extension of plaintiff's probationary period and the termination of his employment;

b.  Title VII and NYSHRL hostile work environment claims against the County and the Sheriff's Department;

c.  Section 1981 discriminatory employment action claim under § 1983 against the County, the Sheriff's Department, Sheriff Middaugh in his official capacity, and Undersheriff Pavarati and Chief Deputy Chapple in their individual and official capacities, as it pertains to the extension of plaintiff's probationary period and the termination of his employment;

d.  Section 1981 hostile work environment claim under § 1983 against the County, the Sheriff's Department, Sheriff Middaugh in his official capacity, and Lt. Johnson and Sgt. Sowich in their individual and official capacities; and

e.  Fourteenth Amendment equal protection claim under § 1983 against the County, the Sheriff's Department, Sheriff Middaugh in his official capacity, and

Undersheriff Pavarati and Chief Deputy Chapple in their individual <u>and</u> official capacities, as it pertains to the extension of plaintiff's probationary period and the termination of his employment.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   July 24, 2007
         Utica, New York.